**CHICAGO, R. I. & G. RY. CO. et al. v. CAR-
TER et al.  (No. 527–3996.)**

(Commission of Appeals of Texas, Section A.
April 23, 1924.)

**1. Appeal and error ⬅⟹927 (7)—Facts bearing
on refusal of peremptory instruction for de-
fendant considered on appeal in light most
favorable to plaintiff.**

Where at close of evidence defendant asked
for a peremptory instruction which was re-
fused, facts bearing on question as to whether
it should have been given, for the reason that
there was no evidence to base a finding on
which judgment was rendered, must be consid-
ered on appeal in light most favorable to plain-
tiff.

**2. Appeal and error ⬅⟹1094 (2) — Supreme
Court bound by finding of fact not disturbed
by Court of Civil Appeals.**

The Supreme Court is bound by a jury's
finding of fact not disturbed by the Court of
Civil Appeals, though contrary to the prepon-
derance of evidence.

**3. Appeal and error ⬅⟹1001 (2)—Verdict sup-
ported by substantial evidence not disturbed.**

If there is substantial evidence to support
a finding of fact on a special issue, the verdict
thereon cannot be disturbed, regardless of Su-
preme Court's opinion as to real facts.

**4. Master and servant ⬅⟹330 (3) — Finding
flagman was continuing duties when he killed
teamster held supported by evidence.**

In action against railroad company for
death of a teamster shot by crossing watchman
in altercation arising from decedent's attempt
to cross in front of train, where watchman was
acting within his duties at beginning of alter-
cation, verdict that when he went to his shanty
and got his gun and shot he was continuing his
duties, and that killing was in unbroken con-
tinuation of controversy, *held* supported by
substantial evidence.

**5. Death ⬅⟹14 (2)—Railroad liable under stat-
ute for killing by flagman.**

If, as found by the jury, a flagman was un-
fit to perform his duties, and was continuing
his duties at time he killed teamster in an al-
tercation at a crossing, and his unfitness was
the proximate cause of death, under Rev. St.
1911, art. 4694, the railroad company was lia-
ble.

Error to Court of Civil Appeals of Fifth
Supreme Judicial District.

Action by Minnie L. Carter and others
against the Chicago, Rock Island & Gulf
Railway Company and others. Judgment for
plaintiffs was affirmed by the Court of Civil
Appeals (250 S. W. 192), and defendants
bring error. Affirmed.

N. H. Lassiter and Robt. Harrison, both of
Fort Worth, and Phillips, Townsend & Por-
ter, of Dallas, for plaintiffs in error.

Smith, Robertson & Robertson and Ethe-
ridge, McCormick & Bromberg, all of Dallas,
and Carden, Starling, Carden, Hemphill &
Wallace, of Fort Worth, for defendants in
error.

CHAPMAN, J.  This suit was brought in
one of the district courts of Dallas county
by defendants in error, hereafter called
plaintiffs, for damages against plaintiffs in
error, hereafter called defendants, growing
out of the killing of plaintiffs' husband and
father, one Carter, by a flagman of defend-
ants, named Lesure, at a railway street
crossing in Dallas.

The case was submitted to the jury upon
special issues, and upon which the jury
found the following facts in the language of
the Court of Civil Appeals:

"The jury found at the time Lesure went to
the shanty, got his gun, and killed Carter, he
was continuing in his duties as watchman to
deal with Carter; that the shooting was an un-
broken continuation of the controversy; that
Lesure was an unfit person to perform the du-
ties required of him as watchman; that his
unfitness to perform his duties was the proxi-
mate cause of Carter's death; that Lesure was
incompetent to perform the duties required of
him as watchman; that such incompetence was
the cause of Carter's death; that the appel-
lants by the use of ordinary care could have
found out prior to the occasion of the tragedy
that the watchman was an unfit person to per-
form the duties of his employment; that the
watchman, Lesure, did not kill Carter in self-
defense; that Carter was not guilty of any
negligence either in his conduct or words upon
the occasion of the difficulty resulting in his
death."

Judgment was rendered in favor of plain-
tiffs, from which defendants appealed to the
Court of Civil Appeals of the Fifth District,
which court affirmed the judgment of the
district court. 250 S. W. 192.

[1] At the close of the evidence defend-
ants asked the court for a peremptory in-
struction, which was by the court refused,
and defendants have now raised the question
in this court that their requested peremptory
instruction should have been given by the
trial court, for the reason that there was no
evidence upon which to base the finding of
a jury that the flagman was acting within
the scope of his duties at the time he killed
Carter.

In considering this question the facts
bearing upon it must be considered in the
most favorable light to plaintiffs, and the
facts upon this issue detailed in the most
favorable light to plaintiffs are as follows:

Commerce street in Dallas runs east and
west, and at the west end of the street was
the Commerce street bridge across Trinity
river; just off the east end of the bridge
were three railroad tracks running north
and south across Commerce street. Between
the railroad and the river, about 12 feet from
the east end of the bridge, on the south side

of the bridge, was located a flagman's shanty. Defendants kept a flagman at this crossing, whose duty it was to watch for trains crossing the street at this point, and to warn and protect the traveling public that crossed the three railroad tracks on Commerce street at the crossing mentioned. The shack mentioned was used by the flagman. On November 9, 1914, a teamster named D. H. Carter was driving a team to a gravel wagon, going west on Commerce street, and approaching the tracks above mentioned from the east, and at the same time a train on one of the three tracks above mentioned was approaching Commerce street from the north; said train being composed of an engine, tender, and gravel spreader car. When the teamster's team reached the track the train was on, or the track next to it on the east, the flagman ran in front of the team and stopped them, and backed them off the track by catching hold of the bridles of the team, and then the train passed, and stopped after getting a few car lengths past the crossing. While the flagman was in front of the team and the teamster on the wagon, just before and at the time the train was passing, the teamster and the flagman were arguing with each other. Immediately after the train passed the flagman said to the teamster, "You d—— son of a b——, you stop until the train passes, and then you can go," and then the teamster began to get off his wagon, and the flagman turned and walked in a fast walk to his shack, and went into his shack. Immediately after the flagman made the last above mentioned remark to the teamster, the teamster got down from his wagon with a whip in his hand, and advanced to within 15 or 20 feet of the flagman's shanty, and stopped, and, immediately after the teamster stopped, the flagman appeared at the door of the shanty, and fired two shots, killing the teamster. At the time the teamster left his wagon the team and wagon were clear of the railroad tracks, and remained at the same place until after the shooting.

[2-4] The great preponderance of the evidence shows that the flagman was acting in self-defense in shooting the teamster, but the jury found otherwise, and the Court of Civil Appeals did not see proper to disturb that finding, so this court is bound by the finding of the jury. The jury found that at the time the flagman went to the shanty and got his gun and killed Carter he was continuing in his duties as watchman to deal with Carter, and we understand the law to be that, if there was any substantial evidence upon which to predicate such a finding, the verdict of the jury cannot be disturbed by this court, regardless of what our opinion is as to the real facts. The Court of Civil Appeals in their opinion say:

"The evidence tended to show that the movement of the train which took it across the track was but the process of clearing a main track, and that the train was ready to come back across the intersection in going on a siding when the altercation was ended by the shooting."

And we are bound by this finding of fact, and, as stated, after the train had passed, the flagman was still cursing the teamster, which would tend to show that the flagman was still trying to keep the teamster from crossing the tracks until the train had recrossed the street after going on the siding. That the teamster was clearly acting within the scope of his employment at the time the personal controversy began there can be no doubt, and the facts also clearly show that the difficulty was a continuous one from the time it began until the shooting, as found by the jury. The whole time of the difficulty was very short, and it would be extremely difficult for us to determine just when the flagman ceased to act within the scope of his employment and began to act as his own master, if he was so acting at the time of the shooting, and under the peculiar facts of this case we do not think that the law can undertake to say just when the flagman ceased to act as agent, or that he did so cease, but that the finding of the jury on that matter should govern.

There being evidence from which the jury might find that the flagman was continuing in his duties at the time he killed the teamster, and, having so found, and having also found that the shooting was an unbroken continuation of the controversy, we cannot disturb these findings.

We think that the law as stated in New Ellerslie Fishing Club v. Stewart, 123 Ky. 8, 93 S. W. 598, 9 L. R. A. (N. S.) 475, is applicable to this case, and is in the following language:

"It is difficult to define with accuracy the point at which the master's liability for the acts of his servant ends, but, under the facts of this case, Proctor, when he attempted to prevent appellee from fishing, and when the altercation between them commenced, was clearly acting within the scope of his employment, and the assault and battery complained of was merely a continuation of the first act. There was no appreciable length of time between them. Everything that was done happened on the premises under the control of the fishing club, and where Proctor had authority as its agent. Where the agent begins a quarrel while acting within the scope of his agency, and immediately follows it up by a violent assault, the master will be liable, as the law under the circumstances will not undertake to say when in the course of the assault he ceased to act as agent and acted upon his own responsibility."

[5] Plaintiffs in error take the position that:

"When no special relationship exists between the company and the person killed, a railway company owning and operating a railroad is not

liable for the willful and intentional killing of a person by the railway company's servant."

We cannot agree with this contention, for the reason that the jury found that the servant was an unfit person to perform his duties, was continuing in his duties at the time of the shooting, and that his unfitness was the proximate cause of the death of Carter, and that plaintiffs in error by the use of ordinary care could have, prior to Carter's death, ascertained that the flagman was an unfit servant, which brings the case clearly within the provisions of article 4694, Revised Civil Statutes.

We recommend that the judgment of the Court of Civil Appeals and that of the district court be affirmed.

CURETON, C. J. The judgment recommended in the report of the Commission of Appeals is adopted, and will be entered as the judgment of the Supreme Court.